IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ██████ ██████ | Case No. 3:24-cv-02135-SB |
| Petitioner, | **REDACTED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES *et al.*, | |
| Respondents. | |

**BECKERMAN, U.S. Magistrate Judge.**

██████ ██████ ("██████ filed a petition pursuant to section 310(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1421(c), seeking de novo judicial review of the United States Citizenship and Immigration Services' ("USCIS") denial of his Form N-400 application for naturalization. The Court held a bench trial on March 20, 2026, at which ██████ licensed psychologist Dr. Marina Valdez ("Dr. Valdez"), and a USCIS officer testified under

PAGE 1 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

oath. (Trial Tr., ECF No. 50.) Based on the Court's findings of fact and conclusions of law, the Court grants ▮▮▮▮▮ application for naturalization.

## FINDINGS OF FACT



1.    ▮▮▮▮▮ is a native and citizen of ▮▮▮▮▮ (Joint Stipulations Fact ("Joint Stip.") ¶ 1, ECF No. 37-1.) He earned a master's degree in ▮▮▮▮▮ and a post-master's certificate in ▮▮▮▮▮ from ▮▮▮▮▮ and currently owns and operates ▮▮▮▮▮ ▮▮▮▮▮ in Oregon. (Trial. Tr. at 42-43.) ▮▮▮▮▮ partner is also ▮▮▮▮▮ and their daughter was born at a local hospital last year. (*Id.* at 40.) ▮▮▮▮▮ attends church, volunteers in his community, and timely pays his local, state, and federal taxes. (*Id.* at 66-69.)

## INITIAL ENTRY AND ASYLUM APPLICATION

2.    ▮▮▮▮▮ lawfully entered the United States on August 12, 2011, to attend ▮▮▮▮▮ pursuant to an F-1 student visa. (Joint Stip. ¶ 2; Trial Ex. 1.) On ▮▮▮▮▮ F-1 student visa application, he indicated that he had never been arrested or convicted of any offense or crime. (Trial Ex. 1.)

3.    On June 29, 2012, ▮▮▮▮▮ filed Form I-589, application for asylum and for withholding of removal with USCIS. (Joint Stip. ¶ 3; Trial Ex. 2.) ▮▮▮▮▮ interviewed with a USCIS asylum officer on September 24, 2012 with the assistance of counsel (Trial Ex. 3) and was granted asylum on September 27, 2012. (Joint Stip. ¶ 4; Trial Ex. 4.)

4.    In ▮▮▮▮▮ Form I-589 application, he answered "yes" to the question: "Have you or your family ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned *in any country other than the United States*?" (Trial Ex. 2 (emphasis added).) ▮▮▮▮▮ answered "no" to the question: "Have you or any member of your family

PAGE 2 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

included in the application ever committed any crime and/or been arrested, charged, convicted or sentenced for any crimes in the United States?" (*Id.*)

5.    In the affidavit in support of his Form I-589 application, ▮▮▮▮ stated under oath that on two occasions he had been arrested, interrogated, beaten, tortured, and humiliated for his political views and activities against ▮▮▮▮ ruling party at the time, the ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[2] (Trial Ex. 2.) ▮▮▮▮ first involvement in ▮▮▮▮ politics began in 2005 when the ▮▮▮▮ government held its national elections. (*Id.*) ▮▮▮▮ distributed flyers and brochures for the opposition party, ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. (*Id.*) When the opposing party refused to relinquish power, tensions in the country grew. (*Id.*) According to ▮▮▮▮ the government forces killed, arrested, and tortured more than 30,000 people at the time. (*Id.*)

6.    During this time period, ▮▮▮▮ was arrested for the first time. (*Id.*) ▮▮▮▮ reported that he was arrested on or about June 21, 2005, at a vehicle checkpoint between the cities of ▮▮▮▮ and ▮▮▮▮ after officers discovered ▮▮▮ materials in ▮▮▮▮ car. (*Id.*) ▮▮▮▮ was detained at the ▮▮▮▮ prison, where he was interrogated and beaten. (*Id.*) After fourteen days in jail, the police released ▮▮▮▮ with a warning to cease all political activities. (*Id.*)

7.    ▮▮▮▮ reported that his second arrest occurred on or about March 24, 2011. (*Id.*) He was working for a non-profit organization at the time and was invited to attend a government-sponsored meeting on the progress of regional economic development projects. (*Id.*) In front of a large crowd, including governmental officials, ▮▮▮▮ openly criticized the government,

---

[2] ▮▮▮▮ provided a detailed account of his arrests and prison experiences in ▮▮▮▮ at trial. (Trial Tr. at 44-60.)

resulting in his arrest. (*Id.*) ▮▮▮ was taken to the ▮▮▮ police station, where he was detained for twenty-two days. (*Id.*) During this time, ▮▮▮ was interrogated and tortured. (*Id.*) ▮▮▮ brother helped to secure ▮▮▮ bail and ▮▮▮ was released on April 15, 2011. (*Id.*) ▮▮▮ brother was taken into custody to be questioned about ▮▮▮ and later died as a result of complications from police beatings and existing health issues. (*Id.*) After his release, ▮▮▮ traveled to ▮▮▮, ▮▮▮ and went into hiding until leaving for the United States on August 12, 2011. (*Id.*)

8.     In his asylum application, ▮▮▮ provided corroborating evidence of country conditions and human rights violations in ▮▮▮ (*Id.*) He also provided corroborating documentation, including letters from friends, family, and employers; his brother's death certificate; admissions and discharge information from ▮▮▮; school records; his birth certificate; his passport; and work certificates. (*Id.*)

## ADJUSTMENT OF STATUS APPLICATION AND RENEWAL

9.     On June 2, 2014, ▮▮▮ filed Form I-485, application to register permanent residence or adjust status. (Joint Stip. ¶ 5; Trial Ex. 5.) In his application, ▮▮▮ answered "no" to the question asking if he had "EVER, in or outside the United States: . . . Been arrested, cited, charged, indicted, convicted, fined, or imprisoned *for breaking or violating any law or ordinance*, excluding traffic violations." (Trial Ex. 5 (emphasis added).) USCIS approved ▮▮▮ Form I-485 application on January 23, 2015, without an interview, and adjusted his status to lawful permanent resident ("LPR"). (*Id.*; *see also* Joint Stip. ¶ 6.)

10.     On December 8, 2024, ▮▮▮ filed an application to renew his LPR status. (Trial Ex. 9.) On December 13, 2024, USCIS approved ▮▮▮ LPR renewal without an interview or additional questions. (*Id.*)

PAGE 4 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

**NATURALIZATION APPLICATIONS AND APPEAL**

11.    ▅▅▅▅ filed his first Form N-400 application for naturalization on January 2, 2019, without the assistance of counsel. (Joint Stip. ¶ 7; Trial Ex. 6.) In response to the question "Have you EVER been arrested, cited, or detained by any law enforcement officer (including any immigration official or any official of the U.S. armed forces) for any reason," ▅▅▅▅ answered "no." (Trial Ex. 6.)

12.    USCIS conducted his naturalization examination under oath on April 22, 2021, at USCIS's Portland field office. (Joint Stip. ¶ 7; Trial Ex. 6.) During the first part of the interview, the USCIS officer reviewed ▅▅▅▅ Form N-400 to confirm its accuracy. (Trial Tr. at 151, 158.) ▅▅▅▅ made several corrections in response to clarifying questions from the officer. (Trial Ex. 15, Pet'r's Apr. 22, 2021 Interview Video ("Interview Video"), ECF No. 48, Part 1A.) When ▅▅▅▅ and the officer reviewed ▅▅▅▅ "no" answer to the questions regarding criminal and arrest history, neither ▅▅▅▅ nor the officer raised any concerns as to the accuracy of his response. (Interview Video, Part 1B.)

13.    In the second part of the interview, the officer "confronted" ▅▅▅▅ on inconsistencies between ▅▅▅▅ Form N-400 application and his prior applications. (Trial Tr. at 158.) The officer did not provide ▅▅▅▅ with a copy of his prior applications. (*Id.* at 75, 185.) According to USCIS, the discrepancy of concern was ▅▅▅▅ conflicting answers about his arrest history. (*Id.* at 147.) ▅▅▅▅ first explained that he interpreted the question about arrests to refer only to arrests in the United States. (Interview Video, Part 1D.) When the USCIS officer continued the confrontation, ▅▅▅▅ again explained that he understood the question to call for recent arrest information after he had arrived in the United States. (*Id.*) ▅▅▅▅ continued to offer further explanations for his answers to the arrest question, explaining that his

interpretation of the question stemmed from different meanings of the word "arrest," as well as the passage of time. (Interview Video, Part 1E.) ▮ apologized and stated that he believed it was just a misunderstanding. (*Id.*)

14.    The USCIS officer asked ▮ about his arrest history. (*Id.*) ▮ outlined his arrests in ▮ including the two arrests disclosed in his asylum application and a third encounter with ▮ officials. (*Id.*) The third encounter happened when ▮ was traveling from his work in ▮ to his home in the south. (*Id.*) ▮ was stopped at a police checkpoint and detained at a location similar to a jail. (*Id.*) ▮ was detained there for several days in what he described as a "low security" prison. (*Id.*) ▮ was later examined by police and released. (*Id.*)

15.    The USCIS officer continued to press ▮ and told him his explanations did not make sense. (*Id.*) Despite being trained in conducting trauma-informed interviews, the officer asked ▮ to recall specific details of the torture he endured in ▮ (Trial Tr. at 185, the officer acknowledged that she asked ▮ to describe which arrests were the worst and who was beating him during his worst arrest). ▮ expressed difficulty in explaining himself to the officer and continued to apologize for any confusion. (Interview Video, Part 1E.) Toward the end of the confrontation, the officer told ▮ "I think you're the reason it doesn't make sense, not me" (*id.*) and the officer later acknowledged at trial that she "got snippy" with ▮ during the interview. (Trial Tr. at 186; *see also id.*, "that was a mistake.")

16.    At trial, the USCIS interview officer testified that although USCIS has a policy allowing applicants to retract any misstatements, "there's no clear rule" with respect to the timing of retractions but it was too late for ▮ to correct any misstatements once confronted. (Trial Tr. at 193, 198.) The USCIS officer acknowledged that similarly-situated

PAGE 6 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

applicants have also misunderstood the criminal history question in the Form N-400 application. (*Id.* at 197, testifying that "[f]rom time to time" N-400 applicants whose asylum claims involved persecution-related arrests in their country of origin answer "no" to the arrest question.) She also acknowledged that once confronted, ▇▇▇▇ never denied being arrested in ▇▇▇▇ (*Id.* at 169-70, 196-99.)

17.    USCIS issued a Notice of Intent to Deny ("NOID") ▇▇▇▇ application on May 18, 2021, notifying ▇▇▇▇ of its intent to deny his application on the ground that he was inadmissible at adjustment, citing alleged material misrepresentations relating to his eligibility for asylum in light of the later inconsistencies in his naturalization application. (Trial Ex. 6.) USCIS cited three inconsistencies: (1) whether ▇▇▇▇ was arrested or detained in ▇▇▇▇ (2) his inconsistent versions of those events; and (3) where ▇▇▇▇ stayed in ▇▇▇▇ immediately before coming to the United States. (*Id.*)

18.    On June 16, 2021, ▇▇▇▇ responded to the NOID. (*Id.*) With the assistance of counsel, ▇▇▇▇ submitted an affidavit and a polygraph report. (*Id.*) ▇▇▇▇ explained that the inconsistencies in his applications were the result of the passage of time, the trauma he suffered in connection with the relevant events in ▇▇▇▇ his desire to forget those events, the stress of the naturalization interview, and the difference between the United States and ▇▇▇▇ calendars.[3] (*Id.*) USCIS denied ▇▇▇▇ Form N-400 application on August 19, 2021. (Joint Stip. ¶ 8.)

///

---

[3] ▇▇▇▇ explained at trial that the ▇▇▇▇ calendar is 7.5 years behind the Gregorian calendar which impacts how ▇▇▇▇ refer to calendar dates (Trial Tr. at 73-74), and the USCIS officer also acknowledged awareness of the differences between the two calendars. (*Id.* at 165.)

PAGE 7 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

19.     ███████ filed his second Form N-400 application on September 27, 2021. (Joint Stip. ¶ 9; Trial Ex. 7.) In light of the USCIS's proffered reasons for the first denial, ██████ amended his application and included the politically-motivated arrests in ██████ that he had already disclosed in his asylum application but had not disclosed in his first N-400 application. (Trial Ex. 7.) On June 14, 2022, ██████ appeared for another examination under oath at USCIS's Portland field office. (Joint Stip. ¶ 10; Trial Ex. 7.)

20.     On July 27, 2023, USCIS denied ██████ second application for naturalization, concluding again that ██████ was not lawfully admitted for permanent residence because he was inadmissible at the time of his 2015 adjustment due to alleged material misrepresentations in his asylum application. (Joint Stip. ¶ 11; Trial Ex. 7.)

21.     On August 23, 2023, ██████ timely requested administrative review of USCIS's final determination by filing Form N-336, request for hearing on a decision in naturalization proceedings. (Joint Stip. ¶ 12; Trial Ex. 8.) ██████ appeared for a hearing on April 1, 2024. (Joint Stip. ¶ 13; Trial Ex. 8.) On August 30, 2024, USCIS affirmed its decision denying ██████ application for naturalization. (Joint Stip. ¶ 14; Trial Ex. 8.) On December 21, 2024, ██████ timely filed this action seeking the Court's de novo review. (ECF No. 1.)

### Psychological Evaluation And Diagnosis

22.     On August 11 and 18, 2025, and November 5, 2025, ██████ was evaluated by a licensed psychologist, Dr. Valdez, in connection with these proceedings. (Trial Tr. at 18-19.) Dr. Valdez evaluated ██████ for about six and a half hours to assess his trauma history and its impact on his psychological functioning. (*Id.* at 19.)

23.     Dr. Valdez diagnosed ██████ with Post Traumatic Stress Disorder ("PTSD") and major depressive disorder at a moderate level based on her clinical interview, observations, and

PAGE 8 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

mental status examinations. (*Id.* at 20, 23.) Dr. Valdez found that ▇▇▇ suffered complex trauma as a result of multiple or chronic traumatic experiences. (*Id.* at 24.) Dr. Valdez concluded that as a result, ▇▇▇ is a poor historian and a disorganized and non-linear narrator at baseline and his disorganization is more severe when retraumatized. (*Id.* at 22-23.) ▇▇▇ trauma response impacted his ability to provide a "neat chronological account" in an interview setting. (*Id.* at 25-28.)

## CONCLUSIONS OF LAW

Having considered the trial testimony and exhibits, as well as the oral argument and written submissions of counsel,[4] the Court hereby concludes:

1.      ▇▇▇ timely filed his complaint and petition for review within 120 days of USCIS's final determination of his application for naturalization, as required by 8 C.F.R. § 336.9(b). (Joint Stip. ¶ 15.)

2.      ▇▇▇ has exhausted all available administrative remedies and timely sought judicial review of USCIS's denial of his naturalization application in accordance with 8 U.S.C. §§ 1421(c) and 1447(a).

3.      The Court has subject matter jurisdiction over this action pursuant to INA § 310(c). *See* 8 U.S.C. § 1421(c) ("A person whose application for naturalization under this subchapter is denied, after a hearing before an immigration officer under section 1447(a) of this title, may seek review of such denial before the United States district court for the district in

---

[4] USCIS's counsel submitted two court filings that contained hallucinated case citations. (*See* Defs.' Suggested Findings Fact Conclusions Law, ECF No. 34 and Resp't's Resp. Pl.'s Objs., ECF No. 36.) The Court allowed USCIS to file amended versions of those documents. (*See* Defs.' Am. Suggested Findings Fact Conclusions Law, ECF No. 40 and Resp't's Am. Resp. Pl.'s Objs., ECF No. 41.)

which such person resides in accordance with chapter 7 of title 5."); *see also* 28 U.S.C. § 1331 (federal question jurisdiction). Venue is proper in the District of Oregon because ██████ resides in Oregon. *See* 8 U.S.C. § 1421(c).

4.      The Court's review of USCIS's denial of ██████ naturalization application is de novo. *See* 8 U.S.C. § 1421(c) ("Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application."); *see also* 8 C.F.R. § 336.9(c) ("The review will be de novo, and the court will make its own findings of fact and conclusions of law."). Pursuant to de novo review, the Court makes its own findings of fact and conclusions of law and is not bound by USCIS's factual determinations or legal conclusions. *See United States v. Hovsepian*, 359 F. 3d 1144, 1162 (9th Cir. 2004) ("[E]ven if the [Immigration and Naturalization Service ("INS")] is allowed to make the initial decision on a naturalization application, the district court has the final word and does not defer to any of the INS's findings or conclusions.").

5.      ██████ bears the burden of demonstrating his eligibility for citizenship and the Court must resolve any doubts in favor of the United States. *See Berenyi v. INS*, 385 U.S. 630, 637 (1967) ("[T]he burden is on the alien applicant to show his eligibility for citizenship in every respect" and "doubts should be resolved in favor of the United States and against the claimant.") (simplified); *see also Hovsepian*, 359 F. 3d at 1168 ("It is plainly true that a naturalization applicant must 'bear the burden of establishing by a preponderance of the evidence that he or she meets all of the requirements for naturalization.'" (citing 8 C.F.R. § 316.2(b))).

6.      To be eligible for naturalization under INA § 316, an applicant must satisfy several requirements, including that the applicant must be "lawfully admitted to the United States

PAGE 10 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

for permanent residence in accordance" with immigration laws. 8 U.S.C. § 1429. To be "lawfully admitted for permanent residence," the applicant must have been admissible to the United States at the time of his adjustment status. *See* 8 U.S.C. § 1255(a)(5); *see also Monet v. INS*, 791 F.2d 752, 753 (9th Cir. 1986) ("We agree that section 1182(c) relief is unavailable to an alien who was not lawfully admitted."). An applicant granted asylum who subsequently adjusts to LPR status under INA § 209, 8 U.S.C. § 1159, is lawfully admitted for permanent residence for purposes of naturalization eligibility under INA § 318.

7.      An individual is inadmissible if he "seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under" the INA "by fraud or willfully misrepresenting a material fact[.]" 8 U.S.C. § 1182(a)(6)(C)(i). A willful misrepresentation is one that is "deliberate and voluntary." *Ruiz v. Nielsen*, 757 F. App'x 628, 629 (9th Cir. 2019) (quoting *Forbes v. INS*, 48 F.3d 439, 442 (9th Cir. 1995)). "Proof of an intent to deceive is not required." *Forbes*, 48 F.3d at 442 (citing *Espinoza-Espinoza v. INS*, 554 F.2d 921, 925 (9th Cir. 1977)). "Rather, knowledge of the falsity of a representation is sufficient." *Id.* (citation omitted).

8.      In addition to knowledge of falsity, a misrepresentation must also be material. *See id.* "The test of whether concealments or misrepresentations are material is whether they have a natural tendency to influence the decisions of the [INS]." *Id.* (simplified) (quoting *Kungys v. United States*, 485 U.S. 759, 772 (1988)). "A misrepresentation or concealment can be said to have such a tendency if honest representations would predictably have disclosed other facts relevant to the applicant's qualifications" and "[t]he government must produce evidence sufficient to raise a fair inference that a statutory disqualifying fact actually existed." *Id.* at 442-43 (citations omitted).

PAGE 11 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

9.        █████ was not inadmissible under INA § 212(a)(6)(C)(i) or any other ground of inadmissibility at the time he applied for adjustment of status to LPR because █████ did not knowingly make any material misrepresentations in his Form I-485, application to register permanent residence or adjust status or Form N-400, application for naturalization.

10.     The Form I-485, application to register permanent residence or adjust status, included a question about whether █████ had ever been "arrested, cited, charged, indicted, convicted, fined, or imprisoned *for breaking or violating any law*," and █████ answered "no" based on his understanding that he was arrested in █████ for politically-motivated reasons, not for breaking or violating the law. (Trial Tr. at 63; *see also id.* at 65, █████ was never charged with a crime in █████ and never appeared before a judge). █████ interpretation of the question was reasonable in light of the nature of his politically-motivated █████ arrests, which USCIS does not dispute.[5] *See Mingyu Zhu v. Miller*, No. 3:19-cv-00035-AC, 2020 WL 1330235, at *8 (D. Or. Feb. 3, 2020) (granting the petitioner's application for naturalization where "[t]he record before the court demonstrates that Petitioner failed to disclose her membership in the [China Communist Party in her application for naturalization] due to an innocent mistake"), *findings and recommendation adopted*, 2020 WL 1324996 (D. Or. Mar. 20, 2020).

11.     In addition, █████ interpretation of the arrest question on the Form N-400 naturalization application to include only arrests in the United States was reasonable in light of the context of the question and the omission of the phrase "in any country other than the United

---

[5] In fact, the USCIS officer who interviewed █████ testified at trial that █████ could answer the question "no" because he had only been arrested for political reasons and that █████ interpretation of the question is not uncommon. (Trial Tr. at 175, 197.)

PAGE 12 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

States" which had appeared in the I-589 application or the phrase "in or outside the United States" which had appeared in the Form I-485 application.

12.    Even if ███████ answered these questions incorrectly by failing to include his ███████ arrest history, any misrepresentation was not willful because ███████ reasonably misunderstood the questions and therefore did not knowingly provide false information. *See, e.g.,* *Melara v. Mayorkas*, 663 F. Supp. 3d 1158, 1167 (C.D. Cal. 2021) ("Petitioner was not inadmissible at the time of adjustment of status under 8 U.S.C. § 1182(a)(6)(C)(i) for having made a material misrepresentation at the time of applying for his U.S. passport by presenting a Puerto Rican birth certificate because, at the time of the application, Petitioner believed his Puerto Rican birth certificate to be genuine. Petitioner did not make a misrepresentation deliberately or with notice of its falsity.") (citation omitted).

13.    USCIS's theory that ███████ knowingly misrepresented his arrest history on the Forms I-485 and N-400 is not persuasive because ███████ had no incentive to attempt to hide or minimize his ███████ arrests from USCIS where those arrests were the basis for his successful asylum application. Indeed, once ███████ understood USCIS's concerns about his answers, ███████ credibly explained the confusion and apologized for misunderstanding the questions. Importantly, USCIS has not presented any evidence calling into question ███████ political persecution in ███████ and the record is undisputed that ███████ has never been charged with a crime or violating the law in either ███████ or the United States.

14.    With respect to ███████ recollection at his 2021 naturalization interview of specific details surrounding the events in ███████ from more than a decade prior, the record reflects that the inconsistencies in ███████ account were largely the result of the passage of time, a language barrier, and cultural differences in describing living situations, geography, and

PAGE 13 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

dates. Notably, the naturalization interview took place sixteen years after ▮▮▮▮ initial arrest in ▮▮▮▮ he appeared at the interview without counsel or access to his prior applications, and he faced lengthy confrontation by a USCIS officer who prodded ▮▮▮▮ to provide additional explanations after refusing to accept his initial explanation about the arrest history question. ▮▮▮▮ inability to recall every specific detail of past events in ▮▮▮▮ was understandable in light of the passage of time, language barrier, and cultural differences, and the Court concludes that ▮▮▮▮ did not willfully provide false information to USCIS. *See Jianrui Lin v. Rosen*, 842 F. App'x 35, 37 (9th Cir. 2020) (finding that "[t]he [Board of Immigration Appeals] erred in relying on [a] discrepancy between December 1 and November to discount [the applicant]'s explanation" where the "trivial" date inconsistency was due to the difference between the Lunar and Gregorian calendars); *Mingyu Zhu*, 2020 WL 1330235, at *8 (finding that the petitioner's failure to disclose her membership in a political party was "an honest mistake").

15.    ▮▮▮▮ also presented credible expert evidence that the trauma he experienced in ▮▮▮▮ and his resulting PTSD impacted the consistency and clarity of his recollection under duress. Dr. Valdez credibly explained why ▮▮▮▮ inability to recall traumatic events under duress does not support an inference of deliberate falsity. Indeed, when USCIS noted the inconsistencies, ▮▮▮▮ explained, corrected, and timely retracted his misstatements. For this independent reason, the Court concludes that ▮▮▮▮ misrepresentations were not willful. *See, e.g.*, *Munyuh v. Garland*, 11 F.4th 752, 760 (9th Cir. 2021) ("[I]t is reasonable and plausible that [] trauma caused by multiple physical [] assaults would impair [the petitioner's] focus at the time on peripheral matters and therefore on h[is] memory of those matters.").

16.    Further, ▮▮▮▮ account of the ▮▮▮▮ arrests during his naturalization interview—including varying details regarding the specific number, dates, and locations of his

PAGE 14 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

arrests and where he stayed immediately prior to leaving for the United States—were not so materially different from his original account to render him ineligible for asylum or adjustment of status. As a result, the Court also concludes that ██████ misrepresentations were not material. *See Forbes*, 48 F.3d at 443-44 (holding that "[t]he misrepresentation [about arrest history] on [the petitioner's] application was not material" where the "government ha[d] presented no evidence 'that a statutory disqualifying fact actually existed'" (quoting *Kungys*, 485 U.S. at 783 (Brennan, J., concurring)); *United States v. Puerta*, 982 F.2d 1297, 1304 (9th Cir. 1992) (finding that the applicant's misrepresentations were not material where "the government ha[d] offered no evidence linking them even tangentially to any statutory ground for disqualification" and "[t]here [wa]s no basis for a trier of fact to conclude that [the applicant] was hiding a criminal record" where "the existence of any disqualifying fact c[ould] only be postulated by indulging in the purest speculation").

17.    ██████ has consistently reported the core facts of his politically-motivated arrests in ██████ and USCIS has not presented any evidence to question whether he was persecuted in ██████ The Court concludes that ██████ misstatements did not rise to the level of willful or material misrepresentations. Accordingly, ██████ statements do not constitute grounds for inadmissibility under INA § 212(a)(6)(C)(i).

18.    For these reasons, ██████ was not inadmissible at the time of his adjustment to LPR status and his admission for permanent residency was lawful under all applicable provisions of the INA. No waiver was required at the time ██████ filed his I-485 application for adjustment of status because he was not inadmissible under any provision of the INA.

19.    ██████ has satisfied the prerequisite requirements for lawful admission for permanent residence under INA § 318. In addition, ██████ has resided continuously in the

PAGE 15 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States for the five-year period immediately preceding the filing of his application for naturalization and is a person of good moral character.

20.    ▊▊▊ has established by a preponderance of the evidence that he meets all statutory requirements for naturalization under INA §§ 316 and 318 and therefore ▊▊▊ is entitled to be naturalized as a citizen of the United States. *See Mingyu Zhu*, 2020 WL 1330235, at *8 (granting the petitioner's application for naturalization); *In re Naturalization of Del Olmo*, 682 F. Supp. 489, 491 (D. Or. 1988) (same); *see also Abbas v. U.S. Citizenship & Immigr. Servs.*, No. 2:23-cv-12873, 2026 WL 897357, at *1 (E.D. Mich. Mar. 31, 2026) ("Based on the evidence presented at trial, and as set forth in the following findings of fact and conclusions of law, the Court holds that Plaintiff's Petition [for Naturalization] must be granted.").

21.    Jurisdiction over an award of attorney's fees and costs under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412, is proper in this action. ▊▊▊ may apply for attorney's fees and costs following entry of final judgment.

### CONCLUSION

For the reasons stated, the Court GRANTS ▊▊▊ application for naturalization and ORDERS USCIS to naturalize ▊▊▊ as a citizen of the United States of America, make arrangements for him to take the oath of allegiance, and issue a certificate of naturalization upon administration of the oath; and RESERVES jurisdiction to determine if ▊▊▊ is entitled to an award of reasonable attorney's fees and costs under the Equal Access to Justice Act.

**IT IS SO ORDERED.**

DATED this 19th day of May, 2026.

_Stacie F. Beckerman_
HON. STACIE F. BECKERMAN
United States Magistrate Judge

PAGE 16 – FINDINGS OF FACT AND CONCLUSIONS OF LAW